DAANEN & JANSSEN, INCORPORATED, a Wisconsin
Corporation, Plaintiff-Appellant,

v.

CEDARAPIDS, INCORPORATED, an Iowa Corporation,
Defendant-Appellee.

Supreme Court

*No. 97–1320–CQ. Oral argument December 15,
1997.—Decided February 26, 1998.*

(Also reported in 573 N.W.2d 842.)

For the plaintiff-appellant there were briefs by *George Burnett* and *Liebmann, Conway, Olejniczak & Jerry, S.C.*, Green Bay and oral argument by *George Burnett*.

For the defendant-appellee there were briefs by *Ronald R. Ragatz* and *DeWitt Ross & Stevens, S.C.*, Madison and oral argument by *Ronald R. Ragatz*.

¶ 1. DONALD W. STEINMETZ, J. This case is before the court on a certified question from the United States Court of Appeals for the Seventh Circuit, pursuant to Wis. Stat. § 821.01 and Circuit Rule 52. The question certified to this court is: In the absence of privity,[1] does the economic loss doctrine bar a remote commercial purchaser from recovering economic losses from a manufacturer under theories of strict liability and negligence? After reviewing the policies on which this and other courts have relied when employing the economic loss doctrine, and applying those underlying policies to this case, we answer the certified question in the affirmative.

¶ 2. The following facts were taken from the Joint Proposed Statement of Relevant Facts issued, pursuant to Wis. Stat. § 821.03(2), by the United States Court of Appeals for the Seventh Circuit. The plaintiff, Daanen & Janssen, Inc. (hereinafter "Daanen"), a commercial business, is a Wisconsin corporation that operates several quarries in Brown County, Wisconsin. As part of its operations, Daanen crushes and sells the

---

[1] For the purposes of this opinion, the term "privity," used with respect to contract, implies "a connection, mutuality of will, and interaction of parties," *Wrenshall State Bank v. Shutt*, 202 Wis. 281, 283, 232 N.W. 530 (1930); it is that "connection or relationship which exists between two or more contracting parties." BLACK'S LAW DICTIONARY, 1199 (6th ed. 1990). Both parties in this case agree that, as to the sale and purchase of the allegedly defective pitman, no privity of contract exists between them.

rock it removes from the quarries. To crush the rock, Daanen utilizes machines known as primary, secondary, and tertiary crushers that include a component called a "pitman."

¶ 3. The defendant, Cedarapids, Inc. (hereinafter "Cedarapids"), is an Iowa corporation that manufactures and sells new crushing equipment and spare parts to distributors that then resell the products to quarry owners. One of Cedarapids' distributors is Aring Equipment Co. (hereinafter "Aring").

¶ 4. In January 1991, Daanen's pitman failed, necessitating replacement. Daanen purchased from Aring a replacement pitman manufactured by Cedarapids. In its distributorship agreement with Aring, Cedarapids provided Aring with a standard express warranty which applied to all of Cedarapids' products, including the pitman eventually sold to Daanen; the warranty states that it applies to Aring's customers. At the time it purchased the pitman, Daanen apparently was unaware of Cedarapids' warranty, and Aring did not pass this warranty to Daanen. In addition, Daanen did not request or receive from Aring a warranty on the replacement pitman; Daanen's invoice from Aring stated that Aring disclaimed all warranty and liability.

¶ 5. Soon after Daanen installed the replacement part in two of its crushers, the machines began to break down. From the 1991 purchase until 1993 there were five or six serious breakdowns of the crushing equipment. These breakdowns were eventually attributed to manufacture and design problems in the Cedarapids' pitman.

¶ 6. After examining the defective pitmans, Cedarapids ordered replacement parts for Daanen. Daanen declined to accept the replacements and even-

tually filed suit in the Brown County Circuit Court, alleging that Cedarapids sold it a defective product that caused over $400,000 in damages, including repair costs, lost revenue, and prejudgment interest. Daanen originally alleged claims against Cedarapids based in both contract and tort law, but has since dropped the contract claims so that only tort claims of common law negligence and strict liability remain. Daanen has not alleged that the defective pitman caused personal injury or damage to property other than the pitman.

¶ 7. Pursuant to 28 U.S.C. § 1332, and based on diversity of citizenship, Cedarapids removed the case to the United States District Court for the Eastern District of Wisconsin, John W. Reynolds, J., presiding. Cedarapids then filed a motion for summary judgment, arguing that under Wisconsin law Daanen could not recover in tort for solely "economic losses." The federal district court recognized that this court has not yet considered whether to apply the economic loss doctrine in the absence of privity, and that other courts have disagreed as to whether this court would apply the doctrine when squarely confronted with the issue.[2] The district court, postulating as to how this court would determine the issue, granted Cedarapids' motion for summary judgment and concluded that the "economic loss" doctrine precludes the plaintiff's tort claims, even

---

[2] *Compare Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1300 (7th Cir. 1991) (concluding that this court would apply doctrine in the absence of privity), *Miller v. U.S. Steel Corp.*, 902 F.2d 573, 574–75 (7th Cir. 1990) (same) *and Midwest Helicopters Airways, Inc. v. Sikorsky Aircraft*, 849 F. Supp. 666, 671 (E.D. Wis. 1994) (same) *with Hap's Aerial Enterprise, Inc. v. General Aviation Corp.*, 173 Wis. 2d 459, 463 n.4, 496 N.W.2d 680 (Ct. App. 1992) (concluding this court would not apply doctrine in absence of privity).

in the absence of privity between the plaintiff and defendant. Daanen appealed this ruling to the United States Court of Appeals for the Seventh Circuit, which then certified to this court the issue now before us. We answer the certified question in the affirmative: even in the absence of privity, the economic loss doctrine bars a remote commercial purchaser from recovering economic losses from a manufacturer under tort theories of strict liability and negligence.

¶ 8. The question whether a complaint has stated a claim for relief is a pure question of law, which we review *de novo. See Sunnyslope Grading, Inc. v. Miller*, 148 Wis. 2d 910, 915, 437 N.W.2d 213 (1989); *First National Leasing Corp. v. Madison*, 81 Wis. 2d 205, 208, 260 N.W.2d 251 (1977). This court is not bound by a federal court's interpretation of Wisconsin law. *See State v. Webster*, 114 Wis. 2d 418, 426 n.4, 338 N.W.2d 474 (1983).

¶ 9. The economic loss doctrine is a judicially created doctrine providing that a commercial purchaser of a product cannot recover from a manufacturer, under the tort theories of negligence or strict products liability, damages that are solely "economic" in nature. *See Sunnyslope*, 148 Wis. 2d at 921. As other courts have recognized, defining "economic loss" is difficult. *See Stoughton Trailers, Inc. v. Henkel Corp.*, 965 F. Supp. 1227, 1230 (W.D. Wis. 1997).[3] Economic loss is gener-

---

[3] In *Miller*, Judge Posner, writing for the court, explained that the cost of replacing a defective product is called an "economic loss" but contended that it would be better to label such a loss a "commercial loss" both because personal injuries and property losses may also be economic losses and because "tort law is a superfluous and inapt tool for resolving purely commer-

ally defined as damages resulting from inadequate value because the product "is inferior and does not work for the general purposes for which it was manufactured and sold." *Northridge Co. v. W.R. Grace & Co.*, 162 Wis. 2d 918, 925–26, 471 N.W.2d 179 (1991). It includes both direct economic loss and consequential economic loss. *See Stoughton Trailers*, 965 F. Supp. at 1231; *Northridge Co.*, 162 Wis. 2d at 926; *see also* 1 James J. White & Robert S. Summers, *Handbook of the Law Under the Uniform Commercial Code* §§ 11–5, 11–6 (4th ed. 1995). The former is loss in value of the product itself; the latter is all other economic losses attributable to the product defect. *See* Steven R. Swanson, *The Citadel Survives a Naval Bombardment: A Policy Analysis of the Economic Loss Doctrine*, 12 Tul. Mar. L.J. 135, 140 (1987). In *Northridge*, we explained:

> Direct economic loss may be said to encompass damage based on insufficient product value; thus, direct economic loss may be 'out of pocket'—the difference in value between what is given and received—or 'loss of bargain'—the difference between the value of what is received and its value as represented. . . .Consequential economic loss includes all indirect loss, such as loss of profits resulting from inability to make use of the defective product.

*Northridge*, 162 Wis. 2d at 926 (citing Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum. L. Rev. 917, 918 (1966)).

---

cial [as opposed to purely economic] disputes." 902 F.2d at 574. Although we recognize that the term "commercial loss" may more accurately describe the loss alleged here, we continue to use the term "economic loss" in our analysis to be consistent and to avoid possible confusion in answering the certified question.

¶ 10. The economic loss doctrine, however, does not bar a commercial purchaser's claims based on personal injury or damage to property other than the product, or economic loss claims that are alleged in combination with noneconomic losses. *See Northridge,* 162 Wis. 2d at 937; *see also Stoughton Trailers,* 965 F. Supp. at 1231; *Moorman Manufacturing Co. v. National Tank Co.,* 435 N.E.2d 443, 449 (Ill. 1982). In short, economic loss is damage to a product itself or monetary loss caused by the defective product, which does not cause personal injury or damage to other property.

¶ 11. This court first adopted the economic loss doctrine in *Sunnyslope,* 148 Wis. 2d 910. In *Sunnyslope,* the plaintiff, a commercial contractor, purchased a backhoe directly from the defendant manufacturer. When the backhoe failed to perform properly, the plaintiff brought a tort action against the manufacturer for damages including the cost of replacement parts, labor charges, and lost profits. *See Sunnyslope,* 148 Wis. 2d at 914–15. At the time of the sale of the backhoe, the manufacturer extended to the plaintiff a written warranty, limiting the manufacturer's liability for defects in the backhoe to repair and replacement costs for a set time period and disclaiming all other liability for direct, incidental, and consequential damages. *See id.* at 913–14. This court denied the plaintiff relief, holding that "a commercial purchaser of a product cannot recover solely economic losses from the manufacturer under negligence or strict liability theories, particularly. . .where the warranty given by the manufacturer specifically precludes the recovery of such damages." *Id.* at 921.

¶ 12. As we recognized in *Northridge,* our holding in *Sunnyslope* was limited to the question there

presented: "whether damages to the product itself and economic losses flowing therefrom are recoverable in tort *when a warranty exists* in a commercial setting. . . ." *Northridge,* 162 Wis. 2d at 927 (citing *Sunnyslope,* 148 Wis. 2d at 911) (emphasis added). One significant issue left unanswered in *Sunnyslope* is that presented here: whether the economic loss doctrine applies where no privity of contract exists between the manufacturer and remote commercial purchasers. *See Stoughton Trailers,* 965 F. Supp. at 1231–32. Although the facts there presented limited our holding in *Sunnyslope,* the policies underlying the economic loss doctrine are not so limited. Applying those underlying policies to this case, we conclude that the economic loss doctrine bars Daanen's tort claims even in the absence of privity of contract between Daanen and Cedarapids.

¶ 13. Application of the economic loss doctrine to tort actions between commercial parties is generally based on three policies, none of which is affected by the presence or absence of privity between the parties: (1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk economic loss, the commercial purchaser, to assume, allocate, or insure against that risk.

¶ 14. First, application of the economic loss doctrine is justified to maintain the distinct functions of tort and contract law. *See East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 866–74 (1986); *Miller v. U.S. Steel Corp.,* 902 F.2d 573, 575 (7th Cir. 1990); *Northridge,* 162 Wis. 2d at 932–33; *Seely v. White Motor Co.,* 403 P.2d 145, 151 (Cal. 1965). From its inception the economic loss doctrine has been

based on an understanding that contract law and the law of warranty, in particular, is better suited than tort law for dealing with purely economic loss in the commercial arena. *See East River*, 476 U.S. at 858; *Northridge*, 162 Wis. 2d at 933; *see also Seely*, 403 P.2d at 151; *Spring Motors Dist. v. Ford Motor Company*, 489 A.2d 660, 673 (N.J. 1985). Although policies underlying contract law and tort law may overlap, they do diverge. *See Spring Motors*, 489 A.2d at 672 (citing W. Page Keeton et al., *Prosser & Keeton on Torts* § 92 at 655–56 (5th ed. 1984)). At the heart of the distinction drawn by the economic loss doctrine is the concept of duty. *See Northridge*, 162 Wis. 2d at 933.[4]

¶ 15. Contract law rests on obligations imposed by bargain. The law of contracts is designed to effectuate exchanges and to protect the expectancy interests of parties to private bargained-for agreements. *See* 1 E. Allen Farnsworth, *Contracts* § 1.3 at 10–11 (1990). Contract law, therefore, seeks to hold commercial parties to their promises, ensuring that each party receives the benefit of their bargain. *See* Swanson, 12 Tul. Mar. L.J. at 158. Accordingly, the individual limited duties implicated by the law of contracts arise from the terms of the agreement between the particular parties. *See Sunnyslope*, 148 Wis. 2d at 916.

---

[4] For a general discussion of the traditional distinctions between contract and tort wrongs see 1 Thomas M. Cooley, *A Treatise on the Law of Torts*, § 2 (4th ed. 1932):

> 'Some attributes a tort has in common with a breach of contract. The duty violated in both cases is one owed to an individual as such and not to the state. . . . But in contract the duty comes into existence only when the duty-bearer has voluntarily undertaken to assume it; the duty is merely to perform a promise. . .In tort, on the other hand, the duty is put upon the individual member of the community often merely because he is such a member. . . .' (quoting Morgan, *The Study of Law*, 36–37).

¶ 16. The law of torts, on the other hand, rests on obligations imposed by law. Tort law is rooted in the concept of protecting society as a whole from physical harm to person or property. *See East River*, 476 U.S. at 866; *see also* Keeton, *Prosser and Keeton on Torts* § 1. Products liability and negligence law, in particular, developed to protect consumers from unreasonably dangerous goods that cause personal injury and damage to other property. *See East River*, 476 U.S. at 866. It is society's interest in human life, health, and safety that demands protection against defective products, and imposes a duty upon manufacturers of those products. *See Northridge*, 162 Wis. 2d at 933; *see also* W. Prosser, *The Assault Upon the Citadel*, 69 Yale L.J. 1099, 1122 (1960).

¶ 17. If, as here, only economic loss is caused to a commercial party, the policy arguments for imposing tort liability are considerably diminished. As explained by the U.S. Supreme Court in *East River*:

> 'The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing its products.' When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong.

*East River*, 476 U.S. at 871 (quoting *Seely*, 403 P.2d at 151 (citations omitted)). By definition economic loss excludes claims for personal injury and damage to other property. Recovery of economic loss is intended solely to protect purchasers from losses suffered

because a product failed in its intended use. *See Northridge,* 162 Wis. 2d at 933. As a result, the general duty of care to refrain from acts unreasonably threatening physical harm is not paralleled by any comparable duty when the harm threatened is merely economic. *See* 12 Colum. L. Rev. at 944. A manufacturer in a commercial relationship has no duty under either negligence or strict liability theories to prevent a product from injuring itself. *See East River,* 476 U.S. at 871. "The duty to provide a product which functions to certain specifications is contractual." *Sunnyslope,* 148 Wis. 2d at 916. Contract law, therefore, is better suited for enforcing duties in the commercial arena because it permits the parties to specify the terms of their bargain and to protect themselves from commercial risk. *See East River,* 476 U.S. at 872–73.

¶ 18.　We do not believe that the absence of privity of contract alters this conclusion. Rather, we agree with the reasoning expressed in *Sullivan Industries, Inc. v. Double Seal Glass Co.,* 480 N.W.2d 623, 629 (Mich. App. 1991):

> The reliance on privity notions to ascertain whether tort or commercial law applies serves only to blur the distinction between, and the applicability of, commercial law and tort law to economic losses. Instead a more logical and conceptionally manageable approach is to determine the type of loss a plaintiff is alleging. (Citations omitted.)

Daanen's allegations are of solely economic loss. Whether alleged against Aring or Cedarapids, Daanen's claims fail to implicate any tort law concerns with unreasonably dangerous products or public safety. They do, however, involve contract law concerns with failed economic expectations. In essence, Daanen

is attempting to recover in tort what are essentially contract damages. We see no reason to extend tort law into an area adequately governed by contract law. *See East River*, 476 U.S. at 871–72; *Seely*, 403 P.2d at 149–51; *Spring Motors*, 489 A.2d at 672; *Casa Clara Condominium Ass'n v. Charley Toppino & Sons, Inc.*, 620 So. 2d 1244, 1247 (Fla. 1993).

¶ 19. Second, application of the economic loss doctrine serves to protect commercial parties' freedom to contract. As a matter of policy, in situations in which commercial parties have allocated their respective risks through contract, "the economic loss doctrine teaches that it is more appropriate to enforce that bargain than to allow an end run around the bargain through tort law." *Stoughton Trailers*, 965 F. Supp. at 1234; *see also Sunnyslope*, 148 Wis. 2d at 919–21. If a remote commercial purchaser is given a direct cause of action in tort against the manufacturer, the entire risk of economic loss is borne by that manufacturer. *See* Note, 66 Colum. L. Rev. at 965. If no such action is permitted, the manufacturer and its distributors and purchasers are free to allocate the risk of economic loss by disclaiming or limiting their respective liabilities by contract. *See id.*

¶ 20. If manufacturers are held liable to remote commercial purchasers under tort theories for frustrated economic expectations, all manufacturers would effectively be prevented from negotiating their liability through the bargaining process. Commercial parties, presumably of equal bargaining power, are generally free to set terms of their own agreement, including warranties, disclaimers, and limitation of remedies. Subject to requirements of good faith and unconscionability, a manufacturer can negotiate with its distributors and purchasers to disclaim or limit its lia-

bility for economic losses. *See, e.g.*, Wis. Stat.
§ 402.719(3) (1995–96) (allowing disclaimer of conse-
quential economic damages). If a commercial
purchaser wants performance guarantees from a man-
ufacturer, it can negotiate for a manufacturer's
warranty. In *Stoughton Trailers*, the district court
explained:

> Courts should assume that parties factor risk allo-
> cation into their agreements and that the absence of
> comprehensive warranties is reflected in the price
> paid. Permitting parties to sue in tort when the deal
> goes awry rewrites the agreement by allowing a
> party to recoup a benefit that was not part of the
> bargain.

*Stoughton Trailers*, 965 F. Supp. at 1230. We agree.
The contractual allocation of economic risk allows pur-
chasers to buy the product at a lower price and in some
situations may be the only way to encourage manufac-
turers to produce certain products. If remote
commercial purchasers can seek full recovery against
the manufacturer regardless of any limitation in the
manufacturer's contract with its distributor, manufac-
turers, in effect, would be deprived of their freedom to
negotiate, allocate, and limit liability. *See* Note, 66
Colum. L. Rev. at 962.

¶ 21. In addition, allowing remote commercial
purchasers to recover in tort for what is a commercial
contract claim would perversely encourage those pur-
chasers to bargain for no warranty or insurance in
exchange for a reduced purchase price because they
could rely on tort remedies as their "warranty." *See
Dakota Gasification Co. v. Pascoe Bldg. Sys.*, 91 F.3d
1094, 1100 (8th Cir. 1996). Withdrawing application of
the economic loss doctrine in this situation would

encourage a remote commercial purchaser, who had been willing to assume the full risk of economic loss, to purchase the goods "as is" in exchange for a lower price; to roll the dice and hope the product does not fail; and to reap initially the financial benefit of a low purchase price. *See Bocre Leasing Corp. v. General Motors Corp.*, 645 N.E.2d 1195, 1198 (N.Y. 1995). If the product does fail down the road, the commercial purchaser could still reach all the way back through intervening transactions, contracts, and warranties to sue the original manufacturer in tort. *See id.* This would grant a commercial purchaser more than the benefit of the bargain to which it and the seller or manufacturer agreed and on which the purchase price was negotiated and paid.

¶ 22.　When Daanen purchased the pitman from Aring, Daanen could have requested that Aring provide an express warranty, which Daanen could have enforced against Aring in a suit for breach of warranty. Daanen chose not to or failed to do so. In addition, Cedarapids negotiated a separate, express warranty with its distributor, Aring, allocating risk between them. Daanen did not request and Aring did not extend this manufacturer's warranty as part of their agreement. We can fairly assume that the lack of a seller's or manufacturer's warranty was reflected in the purchase price paid by Daanen. *See East River*, 476 U.S. at 873; *Stoughton Trailers*, 965 F. Supp. at 1230.

¶ 23.　If Daanen were permitted to bypass its bargained-for agreement with Aring and recover its purely economic losses from Cedarapids in tort, the net effect would be to render the contract between Daanen and Aring and that between Cedarapids and Aring nullities, emasculating the law of contracts in the process. Cedarapids could not invoke against Daanen the contractual disclaimer or limitation of liability Aring

negotiated with Daanen; nor could Cedarapids shield itself with the disclaimer of liability Cedarapids included in its contract with Aring. In effect, Cedarapids would be stripped of its ability to limit its liability by contract, and Daanen would receive a full warranty protection against economic risk without having negotiated or paid for that warranty.

¶ 24. We see no reason to intrude into the parties' allocations of the risk of economic loss and to extricate the parties from their bargains. Daanen should not be permitted to opt out of commercial law by refusing to avail itself of the opportunities which that law provides. *See Miller*, 902 F.2d at 575. To extend tort law theories into this situation would drown contract law in "a sea of tort." *East River*, 476 U.S. at 866 (citing G. Gilmore, *The Death of Contract* 87–94 (1974)).

¶ 25. Third, application of the economic loss doctrine encourages the party with the best understanding of the attendant risks of economic loss, the commercial purchaser, to assume, allocate, or insure against the risk of loss caused by a defective product. Allowing a remote commercial purchaser to recover economic loss in tort claims might needlessly impede the efficiency of the commercial marketplace.

¶ 26. The economic loss doctrine promotes efficiency and predictability in commercial relationships by delineating liability spheres solely by reference to contract. Commercial enterprises allocate the risk of loss due to nonperformance among themselves and pass this cost on to the other purchasers by way of higher prices. In this manner, commercial risks and problems generally can be solved with predictable consequences. *See Sullivan Industries*, 480 N.W.2d at 629. To permit tort theories of economic losses arising out of commercial transactions would undermine the law of

contract and make the manufacturer of products potentially liable for unbargained-for and unexpected risks.

¶ 27. Insofar as risk allocation and distribution are concerned, remote commercial purchasers are at least as well if not better situated than manufacturers to assess the impact of economic loss caused by a defective product. Although a manufacturer may be better able than a consumer to assess the possibility of foreseeable personal injury or property damage, it is more difficult for that manufacturer to assess a commercial purchaser's disappointed economic expectations. As the United States Supreme Court explained in *East River*, 476 U.S. at 874:

> Permitting recovery for all foreseeable claims for purely economic loss could make a manufacturer liable for vast sums. It would be difficult for a manufacturer to take into account the expectations of persons downstream who may encounter its product.

A remote commercial purchaser's expectations may be unrealistic or inflated by advertising claims made by someone else in the distribution chain over whom the manufacturer has no control. If a manufacturer cannot accurately predict the scope or purposes for which its goods will be used by all purchasers, that manufacturer would face unknown liability against which it would be difficult and inefficient for the manufacture to insure. *See* Note, 66 Colum. L. Rev. at 965.[5] Even if a commercial purchaser cannot detect product failures

---

[5] For a discussion of the relative insurability of economic loss and the "twin risks" a manufacturer faces when purchasing insurance or self-insuring against consequential economic loss, see Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum. L. Rev. 917, 954–58 (1966).

before they occur, it can at least anticipate problems and insure against them through purchasing insurance or allocating risk by contract. *See* Note, 66 Colum. L. Rev. at 952–58. In this case, even if Daanen could not predict the pitman failure before it occurred, it could have anticipated production problems caused by equipment failures and guarded against such failures by purchasing insurance or through allocating these risks by contract. Forcing commercial parties to negotiate and allocate risk gives manufacturers certainty in pricing goods, since they can more reliably predict future liability and potential damages. *See East River*, 476 U.S. at 873.

¶ 28. When only economic harm is involved, the question whether this court should impose tort liability on manufacturers distills to whether the consuming public as a whole should bear the cost of economic losses sustained by those commercial purchasers who failed to bargain for adequate contract remedies. *See Casa Clara*, 620 So. 2d at 1246. Once manufacturers learn that courts will impose payments in the form of economic loss damages, those manufacturers will include the resulting costs in the price of the products, forcing the consuming public to bear the very cost the commercial purchaser contractually agreed to forego in exchange for a lower price. Such a rule would transform all manufacturers into insurers with seemingly unlimited tort liability. Consumers would then be forced to subsidize or pay premiums for commercial purchasers who choose not to assume, allocate, or insure against their risk of economic loss. The cost of tort protection for economic expectations ultimately would be borne by society. We do not think that the consuming public as a whole should bear the cost of economic losses sustained by those commercial pur-

chasers who fail to bargain for adequate contract remedies.

¶ 29. After reviewing the policies underlying the economic loss doctrine and applying those policies to this case, we conclude that the economic loss doctrine precludes a commercial purchaser from recovering in tort from a manufacturer for solely economic losses, regardless of whether privity of contract exists between the parties.

¶ 30. In its briefs and during oral argument Daanen posited a number of counter-arguments, which we will address in turn. Daanen first argues that because it lacked privity of contract with Cedarapids, application of the economic loss doctrine to its tort claims would leave it with no alternative remedy against Cedarapids to recover its economic losses. This argument does not persuade us that privity should be an element of the economic loss doctrine. As explained above, the economic loss doctrine is aimed at encouraging commercial parties ex ante to negotiate for warranty protection or to take other steps, such as purchasing insurance, to protect their purely economic interests. We will not allow ex post claims of fairness to temper our application of the doctrine here.

██

¶ 31. Since Daanen was free to negotiate for warranty protection with both Aring and Cedarapids, the policies underlying the doctrine applied with full force to its claims regardless of whether it was in privity with Cedarapids. When Daanen purchased the pitman from Aring, Daanen could have negotiated with and paid Aring for an express warranty that Daanen, in the event of a product failure, could have enforced in a suit for breach of warranty. Daanen chose not to or failed to do so. In addition, Daanen could have negotiated with

and paid Cedarapids for a manufacturer's warranty of the pitman that Daanen could have enforced against Cedarapids if the product failed. Again Daanen chose not to or failed to do so. Daanen, therefore, eschewed the very protections specifically designed to shelter it from the particular damages it here alleges.

¶ 32. If we were to adopt the "no alternative remedy" rule suggested by Daanen, a commercial purchaser could voluntarily relinquish its right to sue its privy in contract by agreeing to purchase the product "as is" in return for a rock-bottom price. The commercial purchaser would then be entitled to sue in tort others in the production chain because it has no alternative remedy even though it consciously chose to forego its contractual remedies. Such a result would allow an end run around contract law and would all but destroy the economic loss doctrine this court adopted in *Sunnyslope*. We refuse to adopt such an exception to the economic loss doctrine.

¶ 33. Daanen next contends that to apply the economic loss doctrine to remote commercial purchasers would complicate rather than simplify commercial transactions. We disagree. By answering the certified question in the affirmative, we hope to more clearly define the boundaries of the economic loss doctrine under Wisconsin law. In *Sunnyslope*, we held that a commercial purchaser cannot recover solely economic losses from the manufacturer under tort, particularly where a warranty is given by the manufacturer. *See Sunnyslope*, 148 Wis. 2d at 921. Today we merely apply the economic loss doctrine we adopted in *Sunnyslope* without the particular qualifying language necessitated by the facts of that case. This conclusion simplifies rather than complicates Wisconsin law; whether or not privity of contract exists between the

414

parties, a commercial purchaser of a product cannot recover solely economic losses from the manufacturer under tort theories of negligence or strict liability.

¶ 34. Daanen also argues that to apply the economic loss doctrine in this case would conflict with prior decisions of Wisconsin courts. Again, we disagree. To support this argument, Daanen primarily relies on two cases, this court's decision in *City of La Crosse v. Schubert, Schroeder & Assocs.*, 72 Wis. 2d 38, 240 N.W.2d 124 (1976), and the court of appeals' decision in *Hap's Aerial Enterprises v. General Aviation Corp.*, 173 Wis. 2d 459, 496 N.W.2d 680 (Ct. App. 1992).[6] Each of these cases is factually distinguishable from the case at bar, and the holding of each is limited to the facts there presented.

¶ 35. In *La Crosse* the plaintiff, a remote purchaser, brought an action against the manufacturer of a roof that leaked and required replacement. The court concluded that the plaintiff could not advance a contract claim against the manufacturer because there was no privity between them. *See La Crosse*, 72 Wis. 2d at 41–42. The court, however, held that the plaintiff's

---

[6] Daanen also relies in part on language in *Smith v. Atco Co.*, 6 Wis. 2d 371, 94 N.W.2d 697 (1959); *Spychalla Farms v. Hopkins Agr. Chem. Co.*, 151 Wis. 2d 431, 444 N.W.2d 743 (Ct. App. 1989); and *Fisher v. Simon*, 15 Wis. 2d 207, 112 N.W.2d 705 (1961). Daanen's reliance on these cases can be dismissed without significant discussion. Both *Smith* and *Spychalla* involved claims for damage to property other than the defective product, and were therefore beyond application of the economic loss doctrine. *See Northridge Co. v. W.R. Grace & Co.*, 162 Wis. 2d 918, 937, 471 N.W.2d 179 (1991). *Fisher* is a pre-*Sunnyslope* decision in which privity existed between the parties. The court's decision in *Fisher* is therefore irrelevant to the certified question now before us.

damages to other property and to the roof itself were recoverable in an action based on strict liability in tort. *See id.* at 44. Unlike the plaintiff in *La Crosse*, however, Daanen does not allege damage to any property other than the pitman. Since the economic loss doctrine does not bar claims based on damage to property other than the defective product or economic loss claims that are alleged in combination with noneconomic losses, *see Northridge*, 162 Wis. 2d at 937, the court's analysis and holding in *La Crosse* are inapposite here.

¶ 36. In *Sunnyslope* we expressly recognized that the language of *La Crosse* "was broader than necessary to determine the issue before the court and was therefore dicta."[7] *Sunnyslope*, 148 Wis. 2d at 917. Daanen's reliance on the contrary dicta in *La Crosse* makes clear that our "polite formula for overruling" the language in *La Crosse* was unavailing. *See Miller*, 902 F.2d at 575. We therefore conclude that to the extent that the language in *La Crosse* can be read as inconsistent with our decision here, that language is expressly overruled.

¶ 37. Daanen's reliance on *Hap's Aerial* can similarly be dismissed. In *Hap's Aerial* the court of appeals held that the plaintiff, a remote purchaser of services, was not barred by the economic loss doctrine from recovering damages for its economic loss. *See Hap's*

---

[7] In *City of La Crosse v. Schubert, Schroeder & Assocs.*, 72 Wis. 2d 38, 44, 240 N.W.2d 124 (1976), this court recognized that the economic losses alleged by the plaintiff were associated with alleged damages to property other than the defective product. Unnecessary to the determination of that case, however, we stated: "We are also of the opinion that a strict-liability claim for pure economic loss involving only the cost of repair or replacement of the product itself and loss of profits is. . .not demurrable." *Id.*

*Aerial*, 173 Wis. 2d at 463.[8] Unlike Daanen, however, the plaintiff in *Hap's Aerial* alleged economic damages arising from the defendant's negligent provision of services and not from a defective product manufactured by the defendant. The court of appeals' decision in *Hap's Aerial* was not appealed to this court, and since adopting the economic loss doctrine in *Sunnyslope*, we have not addressed nor do we address here whether the doctrine applies with equal force to damages resulting from the provision of services.[9] As with the contrary dicta in *La Crosse*, the language in *Hap's Aerial*, to the extent that it can be read as inconsistent with our decision here, is expressly overruled.

¶ 38. After review of the underlying reasoning and application of the economic loss doctrine, we are persuaded by the view that contract notions of privity are irrelevant to the question whether a commercial manufacturer owes a duty under tort law to commercial purchasers of its products to protect against the risk that its product, if defective, might damage only itself. Accordingly, we answer the certified question in

[8] In *Hap's Aerial*, responding to the federal courts' prediction that this court would apply the economic loss doctrine in the absence of privity, the court of appeals stated in a footnote that "[t]he Wisconsin Supreme Court has not yet declared that to be the law of this state, and we think that when presented squarely with the question, it will not." *Hap's Aerial*, 173 Wis. 2d at 463 n.4.

[9] We recognize that in this opinion and in past opinions we have cited to and relied upon cases from other jurisdictions in which the transaction giving rise to the claim for economic losses was the provision of services and not the sale of goods. Our reliance on such cases is here limited to a general discussion of the economic loss doctrine and those policies underlying the application of that doctrine.

the affirmative. Under Wisconsin law, the economic loss doctrine bars a remote commercial purchaser from recovering economic losses from a manufacturer under tort theories of strict liability and negligence, even in the absence of privity.

*By the Court.*—Certified question answered in the affirmative and cause remanded to the United States Court of Appeals for the Seventh Circuit.